The final case for argument today is Four Pillar Dynasty v. New York and Company. Thank you. Good morning, Your Honors. I'm David Bernstein with Debevoise & Plimpton. We represent New York and Company in this case. This is an appeal from an award of the disgorgement of profits in a case in which there was no evidence at trial of willfulness and there was no evidence at trial of actual confusion. Clear Second Circuit law requires both of those prerequisites before there can be an award of disgorgement of the defendant's profits. And the district court clearly erred in finding in its post-trial motion, because the court, the district court rather than the jury, had the decision on willfulness and profits, clearly erred in awarding profits. And I would like to make two points this morning. The first point I'd like to focus on is the absence of any evidence whatsoever at trial of my client's subjective intent, which made the finding of willfulness improper. Can subjective intent be inferred from the continued sale after the suit was brought, combined with, assuming that one made this finding, that the infringement was blatant? That is, that any reasonable person served with this complaint would realize that this was an infringing trademark? No, Your Honor, and I'd like to tell you why. First of all, the finding that it was blatant, I think that's the same as saying willful. I'm not sure that blatant means something different. No, blatant, no. Blatant means it's obvious to a reasonable person that this is not a close case. That's different than willful. Willfulness may be inferrable from that. You might infer if you're a fact finder. Otherwise, you might say, boy, any idiot would have seen that this was infringing. But this is not just any idiot. This person really didn't see it. So they're different. One is objective. One is subjective. So there has to be some evidence of subjective intent. And I agree that adverse inferences can be drawn. But before an inference can be drawn, there has to be some evidence in the record that would lead to the conclusion you've just drawn. And I'll explain why that's not true. Mr. Huffman's testimony at trial, did you ask our firm to request they stop using the velocity mark? Yes, did they? Yes, they asked. Did defendants stop? No. At cross-examination, Your Honor, he recanted that. And I would ask you to look. And indeed, Judge Rakoff even questioned him about it. And it's on pages 378 and 379 of the appendix, where he says, OK, you asked your lawyers to stop, and they kept selling. The judge says, how did they ask them to stop? Mr. Hedvig says, I think by suing them. And then Judge Rakoff says at the top of page 379, oh, so it wasn't before the lawsuit. And Mr. Hedvig says, I don't know. I don't know the legalities. And then Judge— That's a bit different, though. No, it is. And Judge Rakoff goes on to say, do you know—this is on the middle of page 378 at line 12—do you know whether or not such a letter was sent? And Mr. Hedvig says, I don't know. And I will tell you, Your Honor, no demand letter was proffered. My client never received a demand letter. Why did Judge Rakoff then rely on that, in part, in his conclusion as to willfulness? If you say that in his cross-examination, you eviscerated that testimony, or your predecessor did, why did Judge Rakoff continue to rely on it in his decision as one of the factors? So, first off, I think as one of the factors, I think he was clearly wrong. But he actually does, in his decision—and I'll just find the cite to it—he does, in his decision, make the point that he didn't remember on cross-examination. And I'll—in my—when I stand up for my rebuttal, I'll give you the page. I do think— Don't we have approximately 1,000 cases saying that it's up to the fact finder, if somebody testifies one way on direct and then testifies inconsistently on cross, it's up to the fact finder to decide what they believe and don't believe? So, that is correct. And I think the real crux of this is, look, we didn't get a demand letter. The first we heard of this was the lawsuit. But whether we got a demand letter, or whether we first heard about it when we got sued— Well, what about— The question is still, did we still sell after that? And we did. We actually liquidated our inventory, because this was a brand that wasn't doing well for New York & Company. And they liquidated the inventory. And one of the reasons they made— What entitles you to liquidate the inventory with an infringing trademark attached to it, particularly given that, if I understand correctly, and I may misunderstand, am I wrong that this is a matter of a tag attached—it doesn't say velocity across the front of the shirt? That's correct, Your Honor. It was only— All you would have had to do was take off the tag, and you would no longer be infringing. That is true, Your Honor. But my client didn't believe that it was infringing. And I— Well, you tell us that. But can't a fact finder infer from the fact that somebody says, look at this, this is infringement. And the jury thinks, or in this case, the fact finding judge thinks, yeah, boy, I'd surely stop. I think any reasonable person would stop. Can't somebody infer from that that this is willful infringement? It's not—that is not enough, Your Honor, for willfulness. Why not? Because there's two separate questions. The first question is, is it infringing? And to decide whether it's infringing, we have a number of factors in the circuit, the Polaroid factors. And the points you're making go to the question of, is it infringing? The question of willfulness is a heightened standard. The question of willfulness is, did you adopt this mark, and did you continue to sell these products, knowing that it was infringing, which requires some subjective knowledge, or in reckless disregard of the high probability of infringement? Right. And the reason— That second element, even more so than actual intent, is something that's inferrable from the circumstance. And maybe this was a wrong inference. Maybe if I were the fact finder, I might draw a different inference. But why can't a fact finder make the inference at a minimum that anyone looking at this product would see that it's at least a very strong risk that it's infringing, which is sort of the definition of recklessness? Because, Your Honor, there are dozens of Velocity products sold in the marketplace with many different products, many different brands. Consumers come to New York and Company stores only to buy New York and Company products. It's a specialty retailer. They only sell their products. So when you go to a New York and Company store, it is only the New York and Company products that you're buying. And is that in the record? It is in the record, Your Honor. Where is that? Since your slide didn't put on any evidence, they put on evidence that New York and Company has specialized stores? I believe—I will check Mr. Hedbet's testimony when I sit down, but I do believe there was testimony about what New York and Company does. What's most important here, though, Your Honor, is what's not in the record. And there was no evidence at all that my client adopted this mark with an intent to divert sales, which is what we see— Speaking about what's not on the record, in the opening statement, you said you were going to call Monzina and Minnelli to say how they did due diligence. They checked it out. They believed there was no conflict here. They did their homework so there wouldn't be any kind of trademark violation. But then you didn't call them. That's right, Your Honor. And the court said, well, I can draw an inference from that, that you didn't call them, as part of the willfulness. Is that wrong to do that if you're the fact finder? Your Honor, you're a trial lawyer as well, and you know that it's the plaintiff's burden to put on their case. And the key issue for my client in this trial was, was there going to be an award of profits? They had already said they weren't— But also, you can draw an adverse inference from the failure to call a witness. And if you draw—and if you say in your opening statement, we're going to call these two people and they're going to tell you how they did the due diligence, it's fair game for your opponent in his or her closing statement to say, he told you they were going to call these two witnesses. They didn't. You're entitled to figure out why it is that they didn't call those two witnesses. And, Your Honor, what the plaintiff said in their opening statement is, we're going to show you the search report that showed that they had knowledge. They didn't do it. They said, we're going to put on testimony for Ms. Monzina. They had designated parts of her deposition. And you could have argued that to the fact finder, too. This is what happens in trials, whether it's a jury or a judge. Arguments are made back and forth about what can be inferred. Now, it's one thing if you say, and I recognize that you make this argument, that they should not have gotten past their case. But once it is established, if we were to conclude that they had barely, barely, barely enough out of this inference of blatancy combined with not stopping, a pretty weak case. But if that gets them to the fact finder, if that gets them past their case, then it seems to me I've instructed juries countless times that if there is a witness who is under the control of one party, and they fail to call that person, and that person's testimony would be expected to be relevant, you can draw an adverse inference from that. So I'm not sure why this isn't in black little law. I actually do agree with that. But before that happens, they still had to make their case. They had to get at least a prima facie case. They had to establish at least something from which a rational jury, even if not me, a rational fact finder could find willfulness. Actually, not a jury, Your Honor. But not because there isn't a jury here. Yes. But you're right. And I think the crux of my point that I'd like to leave you with is that they didn't do it. It's just like in the Securicom case, which was one of Justice Alito's decisions when he was on the Third Circuit. There's got to be something that they put forward that creates that prima facie case. And my point is they said they were going to call Ms. Manzino. They didn't. They said they were going to produce a search report. Yeah. But you don't take that into account in deciding whether they have a minimally sufficient case. You take that into account once you're deciding the facts, if that's the stage you're at. That's correct. But my point, Your Honor, is that they didn't make the minimal case. Just like in Securicom, they put forward no evidence of my client's subjective intent to divert their sales, none at all. And my client was entitled, when they failed to make any showing at all of willfulness, to say, wow, they never made their case. We have the right to rest and not call witnesses. That's enough. And I acknowledge, had they made a case, we would have put forward a case to rebut. But in the absence of facts and circumstances showing willfulness, there's nothing left to rebut, Your Honor. Thank you very much. You have three minutes for rebuttal. And we'll hear from Mr. Solomon. Good morning, Your Honors. I respectfully request one minute for reply on our cross-appeal. No. Oh, on the cross-appeal. Correct, Your Honor. Rebuttal on the cross-appeal. OK. Thank you, Your Honor. My name is Aaron Solomon. I'm from Obed and Obed LLP. And we're the attorneys for the plaintiff in this case. I want to return back to what opposing counsel was addressing with the court. But I want to just first start with the fact that defendant's appeal regarding the discouraging of profits based on two positions, one is that willfulness wasn't demonstrated, and that actual confusion wasn't demonstrated, they're all waived. The district court properly found they were waived. They weren't raised in their 50A motion, which in fact, rather than articulating a grounds, defendant's counsel said at the end of it being rejected that it was as expected and thanked the court and sat down and then rested. They were raised for the first time in a 50B motion, which is inappropriate, and 59E motion. You can't raise arguments you didn't make to a lower court on post-trial briefing. Did the district court cut them off, though, Mr. O'Reilly? Did it cut off Mr. O'Reilly? Your Honor, before we do that, we'd just like to move for a judgment, dash, dash. Yes, okay, that motion is properly made and is equally properly denied. What was Mr. O'Reilly supposed to do at that point? Mr. O'Reilly was supposed to do what the attorney did in Wilson Sporting Goods. He was supposed to stop the court and say respectfully, Your Honor, we have two grounds you're not hearing, you're not understanding, you need to hear. Can we at least put on the record the basis of our motion for appellate purposes? Trial lawyers have to have a certain amount of intestinal fortitude when facing trial judges who are quick on the trigger. Correct. He did not do that, and therefore those arguments are waived. When they were raised in the 50B and 59E motion, just rake off properly. Well, yeah, this raises a marvelously intricate little civil procedure question, right? Because maybe that waives the argument that we didn't get to the, shouldn't have gotten to the jury at all, that you shouldn't have gotten to the jury at all, not the jury, the fact finder, should have been cut off at the pass right there. Maybe that's waived, and that's interesting because it seems to me your adversary is kind of relying on that argument in part. But really what happens is at the end of the trial, it's a bench trial, the judge makes fact findings. Certainly they can argue that the fact finding is clearly erroneous, can't they? A hundred percent. Okay. Made no argument until post-trial briefing. And in the post-trial briefing, they raised arguments that were not made at the trial court at any point. This goes doubly so. But this is, again, now here I think there's a question of the judge being somewhat impetuous. The judge kind of says at the end of the trial, okay, this is what I'm going to find. And then everybody gets, oh, can't we brief it? And he says, all right, brief it. I don't think you can say at this point fairly that what's happening there is a motion to reconsider. There never was a consideration. The judge gave his impression at the end of the trial and then allowed the parties to brief all the issues of fact. Then at the end of the day, he decides the issues of fact. He doesn't say, oh, well, I can't, I'm sorry, but I already made a judgment of fact. And maybe it's wrong, but this isn't a proper motion for reconsideration. He does an analysis of the facts and makes a fact finding. If what he said at the end of the day is clearly erroneous, how can that not be reviewable?  CLEMENT. Your Honor, if I may respectfully address that in two parts. First is, that's not exactly what happened at the trial. In the trial, Judge Rakoff receives an advisory verdict from the jury who unanimously finds the defendants were willful, DeConnick was willful, accepts that, issues his bench verdict of DeConnick was willful, travels the damages, and then upon defendant's counsel, prior counsel's request, they say, since we're going to be filing motions, can you reserve your written opinion, Your Honor, so we can just put our motion first, save your time, which the judge agrees to do. JUSTICE ALITO. Let me ask you another civil procedure question, though. What's the value of the advisory verdict? If he's making his own conclusions about willfulness, the jury entered a willfulness part of their verdict, answered some interrogatories. Is there any value to that when the district court then, on a bench trial aspect of this case, makes his own conclusion? What are we supposed to, how are we supposed to weigh that advisory verdict on willfulness?  CLEMENT. I think the fact that the judge, the district judge, didn't contradict what eight individuals who were observing the same evidence he observed found, it goes, it supports his verdict, it provides comfort, it's in no way binding, and Judge Rakoff acknowledges that it's not binding on him, but eight women saw the evidence, and as Justice Lynch stated earlier, we presented both. I mean, defendants would have you believe we walked into court and said, we own a trademark and sat down. That's not what happened. We presented testimony of how we have $40 million in sales in 2016 alone. We sold 3 million pieces. Our clients have been using the mark for 10 years. They knew about this. The marks are identical. We're Velocity. They're NYC Velocity. THE COURT. As to willfulness, it looks like the only testimony was Hedvett's testimony about note of having his lawyer notify the opposing side, and they continued to sell. Was there any more evidence of willfulness than that in the testimony? You only had one witness yourself. Correct, Your Honor. The evidence was in the blatant infringement itself. It was no surprise, as Judge Lynch mentioned earlier, that this would be infringing. They used our trademark. Not only did they use our name exactly in the same products, in the same category of goods, to the same consumers at the same price point, but they even de-emphasized the NYNC by outlining it in white, outlining it in black, and having the center be clear so it would fade into the background, and put Velocity in neon pink. And that image was presented as an exhibit to the jury and to Judge Rakoff, is that right? Correct, Your Honor. And one of those images is in our briefing, in the actual brief itself. He didn't refer to it, though. I saw that it was an exhibit, but I didn't see his mention of that, that kind of cute way of putting their own letters next to, in just clear or white. But he didn't refer to that, though. He didn't refer to that by name, but he did mention to be, I believe I'm paraphrasing, but not a close case infringement, a blatant infringement. It was no surprise. It wasn't like we were Velocity and they were super fast for leggings. I mean, it's the same name and the same product to the same people. And as to the demand letter or demand communication, what did the evidence show from your perspective? The evidence showed our client didn't recall whether it was a demand letter sent or not, or whether it was a complaint. It was a complaint, Your Honor. We issued a complaint, and then we repeatedly demanded after the complaint that they cease. In fact, I personally called Defendant's Counsel several times, prior counsel, to say, first stop, and then we'll figure the rest of this out. That wasn't presented as evidence in the trial? No, it wasn't, Your Honor. What was presented as evidence in the trial was there was a request to stop, and there was a complaint, and it was not a particularly close case, and it was blatant infringement, and they continued selling, undisputedly, through the litigation, through the trial, and even after they got an injunction against them, they sold for two weeks after that, which I know that's not part of the trial record, but that was part of the record by the time Judge Rakoff issued his decision on the 59E and 50B motions. He had already known that that was the case and was not particularly pleased with that. So on a related but different issue, is there anything except the finding of willful infringement that we've been talking about now that makes this an exceptional case under the Lanham Act for purposes of attorney's fees? Yes, Your Honor. There's a substantial attorney's fees award. The standard seems to be somewhat up in the air after the Octane fitness decision. Correct, Your Honor. Defendant's Counsel urged this court to apply Octane. We'd be more than happy with the court applying Octane. There is, just like willfulness, and we address in our brief that the lower courts in the circuit are unclear whether or not willfulness after the 1909 amendment is a mandatory obligation or not, because Bash was before the amendment. Same with Octane. The courts are asking whether or not Octane applies to trade. It's a patent case, whether it applies to trademarks in this standard. But whether it applies or not doesn't change the calculus. In fact, Octane lowers the standard, in our opinion, because it has a two-part analysis. It tends to focus some on the conduct of the litigation as opposed to the willfulness of the prior infringement, though. Well, it's an or. It's whether it's the strength of the case, both factual and legally, or the litigation conduct. And on both grounds, Judge Rakoff found it proper to award attorney's fees, because strength, in his mind, was not a particularly hard question. They sold $2 million worth of product, and they continued selling. Of course, the district court did not explicitly apply the Octane fitness standard. Are you saying that his findings implicitly satisfy it, and we should affirm on that ground? Or are you saying that we should apply the Octane fitness standard? Why wouldn't we have to? If we say, you are applying old circuit case law, that's very understandable. But the Supreme Court has really changed the game, and we think that Octane fitness is the standard. Wouldn't we have to remand for the judge to apply that standard? So let me address all the questions. First is, the district court didn't err by not applying Octane, because that's not the standard presently in this circuit for trademark cases. If it were, that would be a different scenario, but it's not as of this morning. If it were, we'd have more clarity. But the standard that he did apply was the appropriate standard, and his finding of exceptional, that this case is exceptional, and that attorney's fees were warranted in order as a deterrence for them doing this again. Because remember, at this point in time, the judges observed that defendants were not particularly close in their infringement. It was a blatant infringement. Anyone could have seen it. They ignored the complaint, the request to stop. They infringed through the trial, after the trial. And in their papers, in fact, they say to the court, you know, we didn't really care, all we cared about was, we didn't care about injunction at all. We didn't care about stopping. But they had no problem liquidating all the goods on our client's trademark rights. So the statement in the paper is that all they cared about was not having profits, and they didn't really care if they got an injunction against them. Well, if they called me day one, we filed the case and said that, then we would have had a very different situation. But instead, we had a jury trial, countless papers, a Second Circuit appeal on a case that they claimed they didn't even care about the product in the first place. They did. They used our mark. And the factors under the Circuit Law or Octane still would corroborate Judge Rakoff's discretion in awarding these. So I know the red light is on, but could you take a minute and address your argument on the detrebling of damages? Absolutely, Your Honor. After the jury issued their unanimous advisory verdict, Judge Rakoff concurred, found willfulness. He said, I'm awarding treble damages. In their post-trial briefing, defendants filed a 59e motion that raised two arguments for why the trebling was inappropriate. It was, one, that the line of Mac doesn't permit trebling on profits, which isn't true. There's no limit on what a judge can do to enhance or decrease a profit award. And two, both these arguments, the argument was also rejected by the Court out of hand. The Court then said— Let me just clarify. The award, though, the disgorgement award, was based on gross profits in any event, right? Correct. The second prong of their point was that it was unfair to have profits trebled because defendants, plaintiffs had gotten enough, so to speak, because defendants didn't include incentive deductions from their gross profits. They stipulated to gross profits, and they did so because they couldn't articulate which floor of the factory or which particular designers were destined for this product, because that's just not how their—the deposition testimony didn't shake out that way. Why is it just ultimately the district court's discretion, right? It's not like one of these statutes that says if the plaintiff wins, the plaintiff gets treble damages. It says if the plaintiff wins, the judge can decide what's appropriate up to treble damages. So why can they—what's wrong with what the judge did? Why is it an abusive discretion to decide that his impulsive first response—and maybe by this time in the litigation, Judge Rakoff might have been getting the idea that maybe he should wait and hear from people first before giving his impulsive response—that his impulsive first response was maybe a little overdone and that the fairest thing to do was to award single damages? Judge Rakoff's response—I mean, I was there. It wasn't—it was impulsive. It wasn't impulsive. It was a reaction to the disparity of the evidence and defendant's conduct. Had there been oral summations? There were to the jury. So the judge heard argument. A hundred percent. Even if it was not directly addressed to— Correct. And we have requested treble damages, that the profits be trebled. And if it was something that the defendants believed was not something that the two arguments they made in the 59E motion was, you can't do it, Judge, number one, and it's not fair because our incremental deductions weren't included, even though they stipulated to profits, those— Are you really saying that once he says that, now there's something other than an abusive discretion standard that applies for him to reconsider after hearing full briefing from the other side and having the opportunity to evaluate all these issues? The court rejected defendant's 59E motion grounds and then on its own made reasons why it believed it was going to go back and undo its trebling damages. And you're saying he cannot do that? He lacks the power to do that? I'm not. So you're saying it's an abusive discretion for him to do that? Abusive discretion when he did that because he did not take into account things that were in the record at that point because we were addressing in our papers their arguments more squarely than— Okay. But it's more of an abusive discretion to do that than it would have been for him to at the end after the jury's advisory verdict, I'll reserve decisions, send me briefing? In other words, is there any real impact on our review of his decision because he changed his mind? It's not so much that he—well, I think you actually did hit it squarely. It's that he changed his mind. He didn't just ask for briefing and then say, okay, having had the briefing, here's my ruling. He made a decision and then on a 59E motion changed it for reasons not contained in 59E motion but that misapplied and were an abusive discretion given what was actually presented at trial. We presented at trial factors very similar to Mark where they entered the marketplace on our back. They advertised as a new active—they didn't do active work before. They advertised a new active work collection using our trademark. We'd spent millions and years developing the brand and getting our name out there and we're in TJ Maxx, we're in Burlington, we're in Ross stores. To do that costs time, it costs energy, it costs effort, and it costs expense. And as a result of that, the troubling award should have been kept in place. We met the factors in Mark and that wasn't—it was an abusive discretion to reconsider that and to go back on that after his initial finding in the courtroom. Okay. Thank you very much. Mr. Bernstein, you have three minutes rebuttal. Thank you, Your Honors. Judge Lynch, in Securicom, the trademarks were Securicom and Securicom. Exactly the same marks, exactly the same goods. And the Court in that case, Justice Alito, found that that, plus the fact that they didn't stop using the mark after they sued, wasn't enough. Willfulness requires more, Your Honor. And what this Court has said, and indeed I would point—well, let me—the Securicom case relies a lot on the Second Circuit, by the way, but that case is really on all fours and I would urge the Court to at least review that decision before you make a final decision in this case. What the Court said is that it has to be an aura of indifference for willfulness, not just infringement, which are the Polaroid factors, but willful infringement, the aura of indifference, in a way that was calculated to appropriate or otherwise benefit from the goodwill the plaintiff had nurtured. In other words, it's not just infringement. You see lots of infringement cases. There's lots of run-of-the-mill infringement. But willfulness, to allow the award of profits when they came in with no evidence at all of damages, no evidence that they lost any sales—in fact, their sales doubled during the relevant period—so they didn't say we've been harmed by this in any way from the sales in New York and company stores. But if we're going to force the disgorgement of profits, there's got to be this egregious nature of willfulness, that we were taking advantage of their mark for their mark. And what I'm saying, Your Honor, is that the fact that the marks were the same—well, not exactly. It was New York and C Velocity and Velocity, but Velocity was in both of them. Securicom, Securicom. The fact that we continued to use it after we were sued, just like in Securicom, that's not enough for this additional element of, was it willful infringement? JUSTICE BREYER. Just to follow up on that, what you're saying is that the legal standard of willfulness is not just, yeah, I know that this is their trademark and we shouldn't use it. It's also something else. It's also an intention to free ride. So if your client had come in or the president of your client had come in and testified at trial, well, yeah, we knew they had a trademark. We knew we were using the exact same trademark. But we kind of figured that most people who come to our stores, as you said earlier, are just coming because they like our stuff. And they're not really aware of these other people's trademark. So we can go ahead and infringe and it really won't do them any harm. If somebody came in and testified to that and it was believed, you're saying as a matter of law, that's not willfulness. JUSTICE BREYER. So I'll start by saying, of course, that's not the facts. JUSTICE BREYER.  No, I know. But what I will say— JUSTICE BREYER. Excuse me, but is that not what you are saying?  JUSTICE BREYER. No, it's not. JUSTICE BREYER. Excuse me. It's not an intent to infringe. It's not knowing infringement. It's intent to free ride on their trademark, that is, to divert sales from them to us. JUSTICE BREYER. I am saying that, Your Honor. And the reason is that infringement is about confusion. It's not just that you're both selling products that have the same name, because, quite frankly, that happens all the time in the marketplace. It's that people aren't confused because of lots of facts and circumstances. Had they put forward any facts and circumstances—and that quote comes from a case on which they relied, the N. Sims Organ and Company case—had they come forward with facts and circumstances that we were infringing willfully, as opposed to the marks were the same but we believed we had the right to do it, we believed it would not cause confusion, had they come forward with facts and circumstances, by all means, I think at that point we would have had an obligation to put forward our case. But because they didn't, because they failed to, our client had the right to do what trial lawyers always do, which is to say, we're moving for judgment as a matter of law. And although Judge Rakoff quite impetuously denied it, our client was firm in its conviction on that. Now, I would like to, if I may, just make one other very quick point. I appreciate the red light is on. And that is there's a whole second reason why profits shouldn't be awarded here, Your Honor, and it's actually a legal error. And that is that in this circuit, the law has long been, since Judge Hand, in fact, that you have to have actual confusion in order to get profits. And that has been reaffirmed as recently as the WWW Pharma case, in which this Court said, proof of real and precise actual consumer confusion has long been a requirement in this circuit for a plaintiff to recover any monetary award, damages or profits. And that is a second independent reason why there should not be an award of profits in this case. If Your Honors would like, I can address the attorney's fees or the waiver arguments, although I do think they're well handled in our brief. We have them. Thank you, Your Honors. To your arguments, do you want to have a moment? Or since we have kind of moved on, it may not be necessary. Very briefly, Your Honor, just if I may, to respond to the actual confusion which was just now, the actual confusion standard, that be requirement, is not contained, as Defendant's counsel suggests. And BASH sets forth three different methods for obtaining damages. It's in our papers. But one of them is deterrence alone. But on top of that, there's the- I give you a minute to respond to the detrebling argument, which really was not made now. So I think we have the arguments on the papers. All right? Thank you, Your Honor. Very good. Thank you for your arguments. We'll reserve decision. This is our last case for argument today. We have one other case that's on submission. Shannon V. Vinatozzi. And the clerk will please adjourn court.